Mr. Ashford. Mr. Ashford, are you Corporate Counsel with Dow? Yes, sir. Nice to see Corporate Counsel here. Good morning. Nice to be here. Good morning, Your Honors. May it please the Court, my name is Ray Ashford, and I'm a Senior Counsel at the Dow Chemical Company, and I'll be representing the appellants, all of whom are Dow employees, currently, or former Dow employees. Seated to my right is Mr. Jay Hoffey, who is also a Senior In-House Counsel with the Dow Chemical Company, and representing the appellants in the present case. You've got four elements in this claim. All of them exist in the prior art, and the prior art's all pretty close and interrelated. Wouldn't want a skill in the arts knowing these know how to recombine them and come up with this claim convention. I think that's the essence of the misunderstanding of the examiner and the PTO. If you look at the first prior art reference, that's BUSI, which essentially the examiner... BUSI? Are we talking BUSI? Yes. Okay. With regard to that case, that is actually CEMEX technologies. It is a catalyst provided to Dow Chemical. We know that technology better than anyone else. That catalyst is provided for solution polymerization. Solution polymerization essentially is conducted polymerizing a polymer in solution polymerization process. Polymerization typically is, if you think of individual monomers, if you think of individual monomers to be pearls, taking those individual pearls and put them on a string that will give you a necklace. That's the long chain of polymer that you would have. But Mr. Ashberg, as Judge Rader pointed out, you have a composition claim here consisting of four components. They are all in the olefins. It's obvious to put them together. Do you think this would get past the KSOC? Yes, sir. What unexpected properties have been shown in the record? And that's the point I was trying to make with the PTO. The burden has not passed to the applicants. The PTO did not establish a prima facie case of obviousness. If you look at BUSI, it's a catalyst for solution polymerization. Why isn't there a prima facie case for a claim with four components, all four of which are in two or three references within the same field? Why isn't that a prima facie case? The reference one is a catalyst specifically for solution polymerization. The innovation, which is also a 50% subsidiary now, targets essentially polymerization and gas phase. Solution and gas phase, they're two different worlds. And that's the quo? Yes, that's right. BUSI is giving us the metal ligand, Quo is giving us the modifier and the spray drying, and Nunez is giving us chemically and thermally surface modification. Isn't it all there? No, sir. If you look at our claims, we have four components, which is one, the first one is a support, which is surface modified. Second, we have that group four metal. What is missing from the prior art? The prior art, it's like saying that you have a mode of transportation, and in that mode of transportation you have a race car, a fighter jet, and a submarine. And taking the engine from the race car and the wings of the jet fighter, and put it on the submarine, and that submarine will fly. How broadly are we going back to define the field? These are all submarines, they're all olefins. They are, but they are conducted in different polarizations. We've got the chemical expert here, but he said himself this is all closely related. First, the BUSI essentially gives the ligand, it talks about the co-catalyst, it talks about the support, but it's not surface modified. So the examiner uses the second prior art, the reference, to supplement the surface modification. They make a statement as that surface modification is being done in all, it's always being done, whereas PTO admitted that reference one does not require that surface modified. If it's always, then how come we don't have that same surface modification in first reference. With regard to the third reference, that's a cat. You seem to be attacking all the prior art individually, but you're not addressing the combination. The combinations, your honor, if you look at the third reference that's supposed to provide the modifier, and the spray drying method, if you look at that prior art, you will see that component A, B, C are combined in a spray drying method, and then later heated and contacted with component four. That does not equate to taking all four components, put them in a solution or a slurry, and spray dry. The spray drying, essentially taking this component, you will take that and spray it into a heated environment, and remove the solvent, evaporate the solvent, or the media, and make individual particles. It's the same as if you take a cake mix, and add the sugar, and put it in the oven, and at the end of the day you'll have a cake. But if you take the cake mix, and put it in the oven, and then sprinkle it with sugar, you're not going to get the same cake. That's the difference. That the three references combined together will leave a person skilled in your... Part of the problem, using your analogy again, we've got some pretty high-level chefs that are all cooking. They know when you put the sugar in the cake. Yes, Your Honor, but at the same time we're talking about... They know they're baking a cake, and they know they have all the elements of the cake in three boxes. At the same time we have... And they're going to know how to take the sugar from one box, and put it with the flour in the other box, and the eggs in the third box. And it's the motivation that they will do it. If we're taking a catalyst system, and we make the changes, that catalyst system is going to go into a ten million dollar reactor. That chef is not going to risk their job to put that catalyst system the way we've modified from all the combinations. According, if you take the teachings of reference three, you will take A, B, C component of our system, spray-dry it, and then contact it with the fourth component. That is not what we do. We take all four of them, we put it into a solution or slurry, and then spray-dry it. Those two are completely different. First, the combined teachings of all three references do not teach what we have. Second, the only thing that the examiner comes back for putting essentially to achieve our composition is the fact that these three references are in the same field of endeavor as the invention. Well, we have two different processes that are completely world of difference between a gas phase and a solution polymerization. And taking a catalyst that was made for solution, obviously, if the inventors in Boosie, they thought they could do the same thing and use the modifier and the spray drying to form these small particles so that it could be used for the gas phase, they would have definitely put it in that first reference themselves. And going back to the question, it, during the examination, the PTO essentially bears that initial burden of establishing a permafixed case of obviousness. And if the PTO fails to establish that burden, the patent, the mere conclusory statements, the examiner keeps going back and says, because reference two describes, mentions, one surface modified, commercially available surface modified for a metallocene catalyst, which is a different catalyst than what we have. The metallocene catalyst has a metal group that has a high binding, whereas our catalyst does not. This is a post-metallocene catalyst. There's a difference between that catalyst and the reference two catalyst and combining that and try to say that it's always done. If it's always done, reference one is a good example of not always being done. So that conclusive statement does not stand. There are instances that surface modified catalysts... Is this your argument regarding the unpredictable nature of the chemical process? Your Honor, the unpredictability is the basic knowledge about chemical industry. If you modify the catalyst, the way we have modified it, and that catalyst is going to go into a 10 million dollar reactor, any minor changes in the structure of catalyst, spray drying is essentially taking the solution of different components... But you're assuming that people skilled in the art of using 10 million dollar reactors are not going to know the characteristics of the catalyst. They do. That's their job to know those characteristics. They're going to know which catalyst they have to use, right? Right, but there are so many possibilities for this combination. We refer to... But we have them all in the prior art here. We refer to that as a... Reference three uses it for a completely different purpose. Using the same component to essentially solve some of the problems of the polymerization process. Even if you look at the reference three, the teachings, if you look, you have the catalyst and then that catalyst system, which includes the co-catalyst, the ligand, and the support, then it's heated and it's contacted with the modifier. Shall we hear from Ms. Rashid and save your rebuttal time? Thank you. Ms. Rashid. May it please the court. Here, there is no evidence in the record that the process limitation provides any structure to the product claims here. Relying on the court's precedent and in re-thought, the examiner fully considered the process limitation, but there is no evidence in the record even implying that those process limitations provide some structure to the end product. Mr. Ashford says there's no prima facie case to combine all these. You're dealing with liquid phase catalysts and gas phase catalysts, and that there are lots of possibilities. So what makes it so obvious to put these together? Your Honor, Quote provides the motivation to Mr. Ashford's argument. Quote is not limited in any way to combining A, B, and C, and then spray drying that, and then combining D. Quote teaches in column 18 in the appendix, if I can find the page, Quote teaches that you can spray dry the entire catalyst flurry to provide the catalyst particles. So Quote is not limited to doing A, B, and C, and then adding D. Furthermore, the appellants generally rely on column 16 through 18 in Quote to say that that's how it's done. In column 16 of Quote, at line 57, it says, Quote, in a more preferred method, a carboxylate metal salt is combined with a heated polymerization catalyst that has been formed in a ligand, preferably in a flurry, or combined with a substantially dry or dry polymerization catalyst that has been placed in a liquid and reflurried. So the claim here is broad enough to encompass where A, B, and C are spray dried, and then they're reflurried again, and then spray dried again. Now, the Board gave us a one-page opinion. Does that properly take into consideration the unpredictability of this art? Your Honor, the Board's decision is one-page, but the Board adopted, this isn't a rubber stamp affirmance of the law, the Board adopted the examiner's finding, and the examiner's answer was very persuasive, and it listed out all the necessary fact findings and conclusions of law which were needed to support the Board's conclusion in the end. The arguments were fully considered by the Board. Adopting the examiner's answer was just a way for the Board to present its ultimate decision on the issue. We often say that pharmaceuticals and biotechnology are unpredictable arts because you're putting a chemical into the body and you really don't know what's going on inside. Is polymerization of olefins an unpredictable art? As a general proposition, yes, Your Honor, we can, we recognize that olefin polymerization may be an unpredictable art, but the force of that characterization here against an obviousness projection depends on the teachings of the prior art. Here, Quo teaches you that you can add this D element to any polymerization reaction. If you look at column three in Quo, it says at line starting at 52, the combination of the heated catalyst system and the carboxylate metal salt is useful in any olefin polymerization process, close quote. So Quo is telling you that you can add the salt to any polymerization process and it may improve the operability of that process. Quo is not limited to use of just certain catalysts, the way that Mr. Aschberg seems to understand Quo. Quo is not so limited. Quo does talk about conventional catalysts in the art that it uses, but also goes on to talk about bulky ligand catalysts, which is the kind of catalyst that is used in Bowsie and is used in, claimed in Carnahan in claim three. Are there any unexpected results in the record here? None, Your Honor. There is, aside from attorney argument, we have nothing in the record based on affidavit or declaration showing unexpected results here. There are no further questions, Your Honor. Thank you, Ms. Rashid, Mr. Aschberg. Your Honor, on page two, on the appendix, on page 258, actually 259, you will see there are subheadings for conventional metal catalysts, bulky ligand, metallocene catalyst compounds, and then on page 263 you have carboxylate metal salt. When they refer on column 18, on page 265, that the carboxylate salt may be in a solution or slurry or in dry state, preferably the carboxylate metal salt is in substantially dry or dried state, the reference, if you go to page 264, it says the combination, contacting, blending, or mixing of catalyst system or polymerization catalyst with carboxylate metal salt, wherein the catalyst system or polymerization catalyst is heated to temperature greater than room temperature and then contacted with the polymerization. That's on paragraphs of 16 on page 264. Clearly, Cal describes this catalyst system along with the co-catalyst as well as the support, and then it's contacted with the polymerizer, the polymerization, the modifier agent. Contrary to the catalyst of Cal, this is a metallocene catalyst. Our catalyst is a post-metallocene. Difference is you have a metal, a central metal that is pi-bonded in a metallocene, whereas post-metallocene, there is a direct bond, oxygen. Here we have two different types of catalyst systems. Because it worked in Cal, that doesn't mean it will work for any catalyst. And with that, I conclude. Thank you, Mr. Mashburn. Thank you.